UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JOSHUA ROBERTS, )
)
    *Petitioner,* )
)
v. ) Nos. 2:11-CR-63
)       2:15-CV-143
)
)
UNITED STATES OF AMERICA, )
)
    *Respondent.* )
)

## **MEMORANDUM OPINION AND ORDER**

Pending before the Court is the motion of Joshua Roberts ("Roberts" or "Petitioner"), a federal inmate, to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 and his amendments thereto [Docs. 251, 297-98]. The Court finds the materials thus submitted, together with the record of the underlying criminal case (2:11-CR-63), conclusively show Roberts is not entitled to relief on any of the claims asserted in his petition. Accordingly, the Court will decide this matter without an evidentiary hearing, *see United States v. Todaro*¸ 982 F.2d 1025, 1028 (6th Cir. 1993), and will DENY Roberts' motion.

**I.    PROCEDURAL AND FACTUAL BACKGROUND**

A federal grand jury indicted Roberts on August 9, 2011, charging him, along with multiple co-defendants, with a conspiracy to distribute 28 grams or more of crack cocaine in violation of 21 U.S.C. §846 and 841(b)(1)(B) [Doc. 15]. Roberts, however, was not arrested until July 1, 2013, when he was obtained from state custody by way of a writ of habeas corpus ad prosequendum [Doc. 54]. He was arraigned on July 1, 2013, appointed counsel and entered a plea of not guilty [Doc. 65]. Roberts then filed a series of substantive and evidentiary motions: motion to unseal

1

document [Doc. 75]; motion to suppress evidence of a male suspect running or being suspected of retrieving a weapon [Doc. 82]; motion to suppress evidence of marijuana [Doc. 86]; motion to suppress audio-visual records [Doc. 88]; motion in limine to exclude his prior felony convictions [Doc. 90]; motion to suppress evidence of room keys [Doc. 92].

On the motion to suppress marijuana [Doc. 86], the government agreed it would not use that evidence in its case in chief, and the Court then found that motion moot [Doc. 128]. The Court also granted Roberts' motion to unseal [Doc. 132]. An evidentiary hearing was held before United States Magistrate Judge Dennis Inman on September 19, 2013. The Court treated Roberts' motion to suppress [Doc. 82], in actuality, as a motion *in limine* [Doc. 144]. The Court found the officer's testimony that Roberts ran towards the rear of the motel suite when a co-defendant opened the hotel door was relevant but that no witness could speculate as to the reasons Roberts ran as he did. [Doc. 144 at 2-3]. Regarding Roberts' motion to suppress all audio-visual records [Doc. 88], the Court again treated this as a motion in limine. The Court noted that video recordings were from recording devices on the officers, which recorded their entry into the motel room and the events that transpired therein. After reviewing the evidence, the Court denied Roberts' motion to exclude the audio-visual evidence [*Id*. at 4]. The Court deferred Roberts' motion *in limine* regarding the use of his prior felony convictions to the District Court [*Id.* at 6]. On Roberts' motion to suppress evidence regarding his possession of the keys to the two motel rooms in his pocket, [Doc. 92], the Court recommended the motion be denied [Doc. 145]. Roberts objected to the Report and Recommendation [Doc. 152]. The District Court overruled the objections and adopted it as the order of the Court [Doc. 153].

On November 5, 2013, the government filed an Information to establish a prior conviction [Doc. 172], indicating that Roberts had a prior felony drug conviction for which he was sentenced

to eight years in the Tennessee Department of Correction in the Criminal Court for Knox County, Tennessee.

On November 19, 2013, prior to the start of his jury trial, the District Court conducted a *Lafler/Frye* hearing. At that hearing, the Assistant United States Attorney indicated that while nothing had been reduced to writing, it had offered a plea to a lesser included offense and that it would forego filing the 851 enhancement [Doc. 305 at 3]. The Court then inquired of Roberts' counsel if that had been discussed with Roberts and he confirmed that he had [Doc. 305 at 4-5]. The following colloquy then occurred between the Court and Roberts:

> THE COURT: Mr. Roberts, you've heard [AUSA] Mr. Bowman's outline of the informal discussions that were had in this case, you've heard Mr. Lloyd [Defendant's counsel] indicate to me that he conveyed all of that information to you; is that correct?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: All right, and upon receipt of that information, did you discuss with Mr. Lloyd, as he has indicated, the pros and cons of potentially pursuing such an agreement in this case?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: All right. And did you consider your attorney's advice with respect to that discussion, if in fact any advice was given?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: All right. But did you ultimately make the decision about how to react, if at all, to that, to those informal discussions?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Was it your decision to not pursue such an agreement?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: In other words, to the extent an informal agreement was offered, that is for you to plead guilty to a lesser included offense and the

government would agree not to file a section 851 notice, was it your decision to reject such an offer?

DEFENDANT: Yes, sir.

THE COURT: All right. Did you understand that had you pursued and ultimately accepted such an offer, you would have faced a 5 year mandatory minimum sentence --- well, maybe not. You would have faced a sentence of less than the 10 year mandatory minimum sentence in the case?

DEFENDANT: Yes, sir.

THE COURT: And you understand that overall a decision to accept such an offer might have resulted in a lower sentence than you will potentially face if you take this case to trial and are convicted?

DEFENDANT: Yes, sir.

THE COURT: Nevertheless, is it your decision to reject any plea offer and proceed to trial today?

DEFENDANT: Yes, sir.

[Doc. 305 at 5-7].

The jury trial then commenced. A number of Roberts' co-defendants testified about their activities with Roberts. Roberts also testified in his own defense, denying he ever saw crack cocaine while in Johnson City, Tennessee, and denying he had anything to do with a conspiracy to distribute cocaine. After a two-day trial, the jury convicted Roberts as charged [Doc. 185]. Roberts filed a motion for acquittal and for a new trial [Doc. 206], which the Court denied [Doc. 230].

A presentence report was prepared which, after applying a number of adjustments, calculated his total offense level to be 28 with a criminal history category of IV, resulting in an advisory guideline imprisonment range of 110 – 137 months. However, because of the statutorily enhanced minimum sentence of 10 years, Roberts' advisory guideline range was 120 – 137 months. PSR ¶ 70. Roberts objected to the obstruction of justice enhancement, the disparate

treatment between crack cocaine and powder cocaine under the guidelines, and that the PSR did not downwardly adjust his offense level by two levels for his minor role in the offense [Doc. 227 at 2-3]. Roberts' counsel also filed a detailed sentencing memorandum asking for the statutory minimum sentence [Doc. 228 at 3]. On March 24, 2014, the Court sentenced Roberts to the statutory minimum sentence of 10 years [Doc. 234]. Roberts timely appealed his conviction and sentence [Doc. 236].

On appeal, he argued there was a fatal variance between the indictment and the evidence presented at trial, that the District Court erroneously admitted evidence at the trial including the admission of the police audio, the motel keys found in Roberts' pocket, that it wrongfully permitted the government to cross-examine him regarding his knowledge of crack cocaine and his assertion that they were just watching TV when the officers arrived, that the District Court erred in denying his motion for mistrial based on the government's question that Roberts was a member of the Gangster Disciples, and for prosecutorial misconduct during closing argument.

The Sixth Circuit accurately summarized the evidence presented at trial against Roberts as follows:

> In June 2011, during a card game in Knoxville, Tennessee, Dwayne Turner told Defendant and four other friends that they could "make 500 [dollars] off of an eight ball" in Johnson City, Tennessee. An "eight ball" refers to one-eighth of an ounce, or approximately 3.5 grams, of cocaine. It usually costs between $250 and $300. Defendant responded, "[W]e need to see what that's about."
>
> Turner contacted Marquesha Jones, his paramour, after the card game. He asked Jones to accompany the group to Johnson City and rent hotel rooms in her name. She agreed in exchange for reimbursement and prescription pills. The group left Knoxville for Johnson City on the night of June 22, 2011. During the trip, Jones personally transported crack cocaine at Turner's request. The conspirators arrived in Johnson City "a little after midnight" on June 23. Jones paid for three rooms at a local Red Roof Inn, renting the rooms until June 24.
>
> Testifying for the United States at Defendant's trial, Jones described the illegal activity that took place at the Red Roof Inn. Jones witnessed Defendant chop up

5

crack cocaine with a razor blade and weigh it on a digital scale. She observed Turner sell crack cocaine from his room and send "customers" to the two other rooms to purchase drugs. Because some customers wanted to buy from only Turner, Defendant also brought crack cocaine to Turner's room, where Turner completed transactions and provided Defendant with the sale proceeds. The crack cocaine sold out by the evening of June 23, so Defendant, Jones, and two other conspirators drove back to Knoxville to resupply. The group returned to Johnson City that night.

On the morning of June 24, the conspirators shifted operations to a neighboring Motel 6 because Turner believed the Red Roof Inn was "getting too hot." Jones rented Rooms 109 and 231 at the Motel 6. Jones testified that she stayed at the Motel 6 that morning for only an hour and a half, before returning to Knoxville in order to go to work.

Motel 6 staff noticed "suspicious activity" and contacted the Johnson City Police Department that day, informing the department that Jones had rented two rooms and that several individuals were staying in those rooms. Thomas Garrison, a Vice and Narcotics Investigator, went to the Motel 6 with Sergeant Eric Dougherty and Officer Mark Hollis.

Upon arriving at the motel, Investigator Garrison detected a "strong odor of marijuana" near Room 231. The officers approached the room in order to conduct a "knock-and-talk." Turner opened the door, and Investigator Garrison saw Defendant run into the bedroom adjacent to the hotel suite's living room. Turner attempted to slam the door shut as the officers pushed their way into the room. Defendant, Turner, and co-conspirators Jamica Woods and Shanna Clark were inside the room at the time of entry. Investigator Garrison immediately followed Defendant into the bedroom and placed him in handcuffs while the other officers secured the living room. Sergeant Dougherty conducted a pat-down of Turner and found a small bag of marijuana.

Investigator Garrison obtained Jones's phone number from Clark. He contacted Jones to ask for permission to search the room, but she represented herself to be Jones's sister. Investigator Garrison instead sought and received verbal consent to search the hotel room from Turner, and the subsequent search revealed four bags containing 67.51 grams of crack cocaine, two sets of digital scales, a razor blade, and a box of plastic sandwich bags used to package the drugs. After searching Room 231, the officers went to the hotel manager and looked through the hotel records, which indicated Jones had also rented Room 109. The officers obtained permission from hotel management to search that room, which was empty, and they found two bags containing a total of 23.46 grams of crack cocaine.

Defendant was indicted alongside some of his co-conspirators for conspiring to possess with intent to distribute 28 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1), based on the discovery of crack cocaine in the two motel rooms. Four of his co-conspirators pleaded guilty for their roles in the conspiracy;

charges against a fifth co-defendant, Marquez Holloway, were dismissed.

[Doc. 247 at 2-4]. After considering all of Roberts' arguments, on February 27, 2015, the Sixth Circuit affirmed the judgment of the District Court. On May 8, 2015, Roberts timely filed this § 2255 petition. On June 15, 2017, Roberts filed an amendment to his motion to vacate [Doc. 298]. The United States filed responses [Docs. 297 and 300]. This matter is now ripe for review.

## II. STANDARD OF REVIEW

This Court must vacate and set aside Petitioner's sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack…" 28 U.S.C. § 2255. Under Rule 4 of the Governing Rules, the Court is to consider initially whether the fact of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief. If it plainly appears the movant is not entitled to relief, the Court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo,* 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961). "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing." *O'Malley*, 285 F.2d at 735 (citations omitted). A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F.Supp. 167, 171 (W.D. Tenn. 1996). To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S.

619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). If the sentencing court lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*, 582 F.2d 1039, 1041 (6th Cir.), *cert. denied*, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States*, 72 F.3d 503, 506 (6th Cir.), *cert. denied*, 517 U.S. 152 (1982).

## III. ANALYSIS

Roberts makes several arguments in his § 2255 motion: (1) his lawyer did not allow him to make his own decisions [Doc. 251 at 4]; (2) his lawyer held "back evidence of calls and letters that would have made the jury make a different decision" and failed to investigate the jail calls that would have exonerated him [*Id.;* Doc. 297 at 1-2]; (3) instead of allowing him to take a plea, he advised him there was no evidence against him [*Id.*]; (4) his lawyer did not listen to his recommendations on what questions to ask at trial [*Id.*]; (5) his lawyer did not review the evidence against him [*Id.*]; (6) his lawyer did not communicate with the other defense attorneys in the case [*Id.*]; (7) his lawyer was ineffective for failing to object to the predicate offense that triggered the mandatory minimum sentence [Doc. 298 at 1]. The Court will address each argument in turn.

### 1. Roberts' claim that his counsel did not allow him to make his own decisions [Doc. 251 at 4].

Roberts states that "instead of allowing me to make my own decisions for myself, [counsel] persuaded me to do what he wanted me to do," [Doc. 251 at 4]. Roberts does not identify what particular decision he claims his counsel made that he did not otherwise concur in. In fact, it is clear from the record that Roberts made his own decisions at all critical stages in his case. For

example, when it came to refusing to enter into a plea agreement with the United States, Roberts made the decision. At the *Lafler/Frye* hearing, the following colloquy occurred between the Court and Roberts regarding his decision not to enter into a plea agreement:

> THE COURT: In other words, to the extent an informal agreement was offered, that is for you to plead guilty to a lesser included offense and the government would agree not to file a section 851 notice, was it your decision to reject such an offer?
>
> DEFENDANT: Yes, sir.
>
> …
>
> THE COURT: And you understand that overall a decision to accept such an offer might have resulted in a lower sentence that you will potentially face if you take this case to trial and are convicted?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Nevertheless, is it your decision to reject any plea offer and proceed to trial today?
>
> DEFENDANT: Yes, sir.

[Doc. 305 at 5-7]. Insofar as the decision to reject the plea offer and proceed to trial is concerned, the record demonstrates that decision was Roberts', and he confirmed as much before the Court under oath.

The same is true when it came to deciding whether he should take the witness stand and testify. The following colloquy occurred between the Court and Roberts prior to his taking the stand in his own defense:

> THE COURT: [Defense counsel] Mr. Lloyd tells me that you have in fact decided that you will testify in this case. Is that correct?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: All right. Is that your free and voluntary decision to do so?

9

|              |                   |                                                                   |
|--------------|-------------------|-------------------------------------------------------------------|
| DEFENDANT:   | Yes, sir.         |                                                                   |
| THE COURT:   | Has anybody pressured you or threatened you or in any way induced you – |  |
| DEFENDANT:   | No, sir.          |                                                                   |
| THE COURT:   | --- to exercise your right to testify in this case?               |
| DEFENDANT:   | No, sir.          |                                                                   |
| THE COURT:   | And is it then still your decision that you will testify in the case? |
| DEFENDANT:   | Yes, sir.         |                                                                   |

[Doc. 191 at 54-55]. When it came to deciding whether to testify, Roberts also advised the Court that it was his decision, that it was voluntary, and that no one had pressured or threatened him or in any way induced him to exercise his right to testify. Roberts' argument that his counsel made all his decisions for him is simply factually incorrect and is undercut by his own testimony to the Court. Because it appears that Roberts made his own decisions in the case, and because he fails to identify any deficiency in his counsel's performance, this issue is without merit.

> **2. Roberts' claim that his counsel "held back evidence that would have made the jury make a different decision" and failed to investigate the jail calls which would have exonerated him [Docs. 251 at 4; 297 at 1-2].**

Roberts contends that he notified counsel that he wanted counsel to investigate jail phone calls between himself and Jamica Woods, a co-defendant in this case, that would have proven "he knew nothing of her dealings." Roberts claims his counsel failed to conduct interviews of witnesses who would have exonerated him. Concerning the jail calls, Roberts indicates these calls were between Woods and himself in which Woods took responsibility for the cocaine. He claims his counsel should have investigated and introduced that evidence to the jury.

The Supreme Court stated in *Strickland* that defense attorneys have "a duty to make

10

reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "This duty includes the obligation to investigate all witnesses who may have information concerning [a] client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). But "[a] defense counsel has no obligation to ... interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (quoting *Millender v. Adams*, 187 F. Supp.2d 852, 877 (E.D. Mich. 2002)) (citing *Marra v. Larkins*, 111 F. Supp. 2d 575, 585 n. 13 (E.D. Pa. 2000)).

When the Court examines the facts of this case, it becomes clear that Roberts' claim in this regard is without merit. The Sixth Circuit noted that, at trial, Dwayne Turner testified that he told Roberts that he could make $500 off an "eight ball" in Johnson City and that Roberts responded "We need to see what that's about." Roberts then traveled to Johnson City in the same car with Jamica Woods, following right behind Turner. Marquesha Jones, Turner's paramour, also accompanied them on the trip to Johnson City and paid for the rooms, one of which Roberts stayed in. Jones testified at trial that she witnessed Roberts chop up crack cocaine and weigh it on a digital scale at the hotel room. After selling what crack cocaine they had, they then travelled back to Knoxville to pick up more cocaine and returned the next day where they stayed at the Motel 6. There, the management contacted the Johnson City Police Department after noticing "suspicious activity." When law enforcement arrived, officers testified they smelled a strong odor of marijuana coming from room 231, where Roberts was present. They knocked on the door, and when Turner opened the door, officers saw Roberts take off running into the bedroom. He was quickly subdued. After obtaining consent to search the room, they discovered 67.1 grams of crack cocaine, two sets of digital scales, a razor blade, and a box of plastic sandwich bags used to package the drugs for resale. In room 109, where Roberts was staying, they found 23.46 grams of crack cocaine.

11

The first issue are the jail calls in which Woods, according to Roberts, takes responsibility for the cocaine. First, although Roberts testified, he never mentioned anything about Woods claiming the cocaine was hers at any point. Contrary to his claim that the cocaine belonged to Woods, he testified at trial that Turner had actually claimed the cocaine was his, not Woods [Doc. 191 at 60]. Second, even accepting Roberts' claim that Woods took responsibility for the cocaine, that would not exculpate him in the least. He was convicted of a conspiracy, not simple possession. To establish a conspiracy, "the government must prove, beyond a reasonable doubt, '(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Robinson*, 547 F.3d 632, 641 (6th Cir. 2008) (quoting *United States v. Caver*, 470 F.3d 220, 232 (6th Cir. 2006)). Even if Woods took ownership of the cocaine that would not mean that Roberts had not entered a conspiracy to distribute cocaine. The government did not have to prove the cocaine actually belonged to Roberts to obtain a conviction for conspiracy. "[I]t is enough to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *Robinson*, 547 F.3d at 641 (quoting *United States v. Martinez*, 430 F.3d 317, 332-33 (6th Cir. 2005)). Roberts does not identify any other evidence he claims should have been introduced which was not. This issue is without merit.

### 3. Roberts' claim that Counsel did not allow Roberts to enter a plea agreement [Doc. 251 at 4].

Roberts claims that "instead of allowing me to take a plea, [counsel] told me Greeneville had no real evidence against me and promised that he could beat it for me!" On November 19, 2013, this Court held a *Lafler/Frye* hearing, as required by the Supreme Court [Doc. 305]. Under oath, Roberts acknowledged that he did not wish to pursue a plea agreement in this case and that

12

it was his choice—and his choice alone—not to pursue any such agreement. For Roberts to now claim that the decision not to take a plea agreement was not his but his attorney's is disingenuous at best. *See United States v. Owenby*, No. 2:12-CR-118, 2017 WL 951698, at *6 (E.D. Tenn. Mar. 9, 2017) (citing *United States v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005) ("Judges need not let litigants contradict themselves so readily; a [§ 2255] motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction")). This claim has no merit.

4. **Roberts' claim that counsel did not listen to his recommendations on questions to ask at trial.**

Roberts argues that counsel did not ask certain questions that he was instructed to ask at trial. Roberts does not identify the specific questions he advised counsel to ask. Without such a showing, it is impossible for the Court to determine the result of the trial would be different. Therefore, Roberts' claim fails to show he was prejudiced by counsel's performance with regard to these questions at trial. In any event, trial strategy, for the most part, is left to the discretion of counsel. *See Strickland*, 466 U.S. at 690. Strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based. *Id.* Roberts has offered no evidence to overcome the presumption that counsels' approach was a matter of sound trial strategy. This issue is without merit.

5. **Roberts' claim that his attorney did not review the evidence against him.**

Roberts claims that his attorney did not review the evidence against him. As noted, to succeed on a claim that he was denied effective assistance of counsel, he must show his counsel made errors so serious that "counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, he must show the deficient performance prejudiced him. *Id.*

A review of the record in this case demonstrates that Roberts' claim his counsel did not review the discovery with him is meritless. He admitted before the Court that it was only after consultation with his attorney that he decided not to take a plea agreement [Doc. 305 at 5-7]. He also admitted that it was only after consultation with his attorney that he decided to take the witness stand in his own defense [Doc. 191 at 54-55]. He can point to none of his counsel's actions in relation to discovery that were deficient. In fact, his counsel filed numerous motions addressing the very evidence that was introduced against. The United States Magistrate Judge held evidentiary hearings for which Roberts was present, addressing the very evidence Roberts claims his counsel never reviewed with him. Again, this claim is spurious and is without merit.

6. **Roberts' claim that counsel did not approach the attorneys of the codefendants.**

Roberts claims counsel "did not take time to talk to the lawyers of codefendants, when two [tried] to testify on my behalf!" [Doc. 251 at 4]. As noted above, a defendant who files a §2255 motion must set forth facts which entitle him to relief. *Green*, 454 F.2d at 53. Petitioner has not identified the two defendants, nor has he filed an affidavit from either indicating a willingness to testify. He has not alleged what their testimony would have been, giving the Court any basis to determine that the testimony, if given, had the potential to alter the result of the trial. This issue is without merit.

7. **Roberts' claim that counsel was deficient in not objecting to the predicate offense that triggered the enhanced mandatory minimum sentence of 10 years.**

Roberts argues that a conviction under Tennessee Code Annotated § 39-17-417 does not match the federal generic definition of a violation under the Controlled Substance Act and thus cannot be used to enhance his sentence under § 841(b)(1)(B). In support, he contends that following the Supreme Court decision in *Mathis v. United States*, ––– U.S. –––, 136 S.Ct. 2243,

195 L.Ed.2d 604 (2016), his prior felony drug conviction no longer qualifies as a valid predicate offense to enhance his sentence.

The government filed a notice to seek enhanced punishment, increasing the mandatory minimum from five years to ten years if he were convicted [Doc. 172]. The notice indicates that Roberts pled guilty on January 30, 2009, to "possession with the intent to sell cocaine," a class B felony violation of Tennessee Code Annotated § 39-17-417, and was sentenced to eight years in the TDOC [Doc. 172-1]. This conviction formed the basis for the enhancement of Roberts' sentence in this case.

Having been convicted of a conspiracy to distribute crack cocaine under federal law, Roberts was subject to the same punishment as those convicted of the underlying offense set forth in 21 U.S.C. § 841(a). See 21 U.S.C. § 846 ("Any person who … conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the … conspiracy"). Section 841(b)(1)(B) provides that "If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years…." A "felony drug offense" means any offense punishable by more than one year of imprisonment that "prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44).

Roberts was convicted of a violation of Tennessee Code Annotated § 39-17-417, a Class B felony offense for which Tennessee law authorizes a term of imprisonment of "not less than eight (8) nor more than thirty (30) years." Tenn. Code. Ann. § 40-35-111(b)(2). Moreover, § 39-17-417 criminalizes the sale of a controlled substance, conduct that clearly "relates to" a controlled substance and would qualify as a prior felony drug offense under § 841(b)(1)(B). *See also Stone*

15

*v. Butler*, 2017 WL 5618289 at *2 (E.D. Ky. Nov. 20, 2017) ("Courts have therefore consistently held that a conviction under Tennessee's controlled substances act qualifies as a valid predicate for an enhancement under 21 U.S.C. § 841(b)(1)(A)").

Petitioner's reliance on *Mathis* is misplaced. In *Mathis,* the Supreme Court addressed whether a prior conviction constituted a "serious drug offense" within the meaning of 18 U.S.C. § 924(e)(1), the Armed Career Criminal Act. What constitutes a "serious drug offense" under § 924(e)(1) is not the same as what constitutes a "prior felony drug conviction" under § 844, which applied to enhance Roberts' sentence. In fact, under § 924(e)(1), a "serious drug offense" includes only those felony drug offenses for which "a maximum term of imprisonment of ten years or more is prescribed by law," which, a "prior felony drug offense" for enhancement purposes only requires the offense be punishable by more than one year. Thus, *Mathis* is not applicable here. In any event, Roberts was not sentenced under the Armed Career Criminal Act, but enhanced under § 841(b)(1)(B). His argument that counsel's performance was deficient for failing to object to this offense based on the application of *Mathis* is without merit.

## IV.   CONCLUSION

For the reasons set forth above, the Court holds that Roberts' conviction and sentence were not in violation of the Constitution or laws of the United States. Accordingly, his motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 and his amendments thereto [Docs. 251, 297-98] are **DENIED** and his motion **DISMISSED**.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit disapproves of the issuance of blanket denials of certificates of appealability. *Murphy v.*

*Ohio*, 263 F.3d 466 (6th Cir. 2001). The district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Id*.

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Having examined each of the petitioner's claims under the Slack standard, the Court finds that reasonable jurists could not conclude that this Court's dismissal of petitioner's claims was debatable or wrong. Therefore, the Court will deny petitioner a certificate of appealability as to each claim raised.

A separate judgment will enter.

*s/J. Ronnie Greer*  
United States District Judge